**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

Don Tran, on behalf of himself and all others similarly situated,

14 CV    7004

                    Plaintiffs,          No._____

        *against*

BANK OF NOVA SCOTIA; DEUTSCHE
BANK, AG; HSBC BANK U.S.A. N.A.; HSBC
BANK PLC,

                    Defendants.

**CLASS ACTION COMPLAINT**
<u>JURY TRIAL DEMANDED</u>



---

On information and belief founded on personal knowledge, ~~published reports and~~ analyses of the silver and silver derivative markets, and the investigation of counsel, Don Tran ("Plaintiff") alleges as follows:

## I.        SUMMARY OF ALLEGATIONS

1.        Between approximately January 1, 2007 and August 13, 2014 ("Class Period"), three of the world's largest silver bullion banks, Bank of Nova Scotia, Deutsche Bank AG, and HSBC Bank USA N.A. ("Defendants") combined, conspired and agreed with one another to intentionally manipulate the price of silver and of silver derivative contracts in violation of the Commodity Exchange Act, 7 U.S.C. § 1, *et seq.* (the "CEA"), the Sherman Antitrust Act, 15 U.S.C. § 1, *et seq.* ("Sherman Act"), and the Clayton Antitrust Act, 15 U.S.C. §§ 12–27, 29 U.S.C. §§ 52–53 ("Clayton Act").

2.        Defendants effected their manipulation to obtain a daily average advantage of 25 basis points over other traders in the silver and silver futures market – translating to an extraordinary annualized return of approximately 87%, since January

1, 2000.  Not only is the anomalously outsized return to Defendants highly suggestive of collusive behavior, the likelihood that Defendants achieved their returns through illegal activity is borne out by reported analyses of the effects of Defendants' conduct on the silver markets over the course of 14 years.  These reports produce a clear picture of statistically irregular activity that is best explained (and likely *only* explained) by anti-competitive trading conduct traceable to Defendants.

3.      The collusive behavior complained of here was operationalized throughout the Class Period in a daily, three-party, simultaneous auction process known as the "silver fix" (hereinafter the process of fixing the price of silver is the "Silver Fixing," and the cartel administering the Silver Fixing is the "Fix").

4.      Defendants were the only members of the Fix during the Class period (the Fix "Members").  The Silver Fixing happened once per day, every business day, at noon London-time, throughout the Class Period.  Members convened by secure conference call to literally _fix_ the price of silver amongst themselves, purportedly based on the orders for the purchase or sale of silver placed by clients or by the Defendants themselves (trading for their own accounts).  There were no observers of the Silver Fixing.  There are no transcripts or records of Silver Fixing minutes. The Fix inhabits a liminal space that lacks the direct regulatory oversight of, for example, the commodity exchanges.  As a result, Defendants and Defendants alone possess first-hand knowledge of the proceedings of the Fix.

5.      The daily Silver Fixing began in 1897, with four brokerage firms convening daily to derive the equilibrium price of silver.  The benchmark price that emerged from these meetings was based on Members' purchase and sale orders

2

(whether for their own accounts or for their clients). During the Silver Fixing, Member firms confidentially exchanged information about their silver needs and thereby derived a price for silver on which their orders were executed. That price (the "Fixed Price") was published and served as a proxy for the equilibrium price of silver on the open market, which was then comparatively inefficient.

6. Since the Silver Fixing was established 116 years ago, however, advents in technology have economized the timely availability of information about supply of, and demand for, silver. The Fix, nevertheless, has retained its historical structure and influence over the worldwide pricing of silver, and continues to set the benchmark price by which silver and silver-backed products are priced throughout the world.

7. In light of the calculable information advantages that accrue in today's efficient market to the trader with prior knowledge of a commodity's price *or price direction*, the nature of the Fix had transformed over time. By the year 2000 at the latest, the Silver Fixing was no longer a proxy process for open market silver pricing. Instead, it became a scheme for Members to capitalize on a marked information advantage: the exclusive insight into the direction of the silver market, minutes or even moments before the public gained access to the same information.

8. Through the device of the Silver Fixing, the Defendants – three multinational banks – have dictated the market prices of physical silver and of silver futures by concerted action. The Silver Fixing directly affects all contracts or financial instruments whose value is derived from the price of silver. This includes silver derivatives contracts, like COMEX silver futures contracts. In the United States, most silver futures contracts are traded on COMEX, short for Commodity Exchange, Inc.,

which is a division of the New York Mercantile Exchange. COMEX is a Designated Contract Market pursuant to Section 5 of the CEA, 7 U.S.C. § 7. The prices of COMEX silver futures are directly and proximately caused by, and directly linked to, the price of physical silver.

9. Despite their responsibility for fixing the market price of physical silver for the entire world, Defendants can and do freely trade silver and silver contracts before, during and after the Silver Fixing. Defendants trade at times when, due to their unique control over the price-point at which silver will trade, they maintained a unique and exclusive information advantage over every other market participant. With complete control over the price-point at which silver would be set, Defendants had the opportunity to establish positions in both physical silver and silver derivatives prior to the public release of Silver Fixing results, allowing them to reap large illegitimate profits.

10. Members' purchase and sale orders are revealed during the Silver Fixing to the other Members only. Throughout the Silver Fixing, Members trade on that information, and share that information only with their clients (and Members' own trade desks) in order to execute client and firm trades. The public market is eventually able to determine the direction of the silver price, as dictated by the Silver Fixing, based on "leakage" of the information that Members communicated to their clients. That is, since Members and clients sold or purchased silver during the Silver Fixing based on the exclusive information available to them during the Silver Fixing process, their trades served as second-hand indicia of silver's market direction. When such trades are executed, the public is able to interpret them, on a delayed basis, to discern whether the

Silver Fixing will publish a price for silver that is higher or lower than the spot price at which silver was being traded before the noon commencement of that day's Silver Fixing. Significantly, the public was only able to pick up this information *second-hand* – after Members already in possession of that knowledge used it to their significant advantage.

11.     The benefit to Members has been calculated to a daily average advantage of 25 basis points over traders who are not privy to the Silver Fixing negotiations; the advantage translates into an annualized return to Defendants of 87%, since January 1, 2000.

12.     In addition to that informational advantage, Defendants also reaped the benefits of artificial suppression of the price for silver during the daily Silver Fixings – a 10 to 12 basis point downward bias in the intraday price of silver, according to Professor Andrew Caminschi, economics professor and leading expert on the silver market.

13.     Throughout the Class Period, the Defendants abused and exploited their positions of exclusive control as Fix Members by intentionally manipulating the price of physical silver and the prices of silver derivatives, including COMEX silver futures contracts, to artificial levels. And, since the report of the price set by the Fix is one of the most important pieces of daily information to the worldwide market's setting of silver prices, and thus silver derivative prices, the Defendants' conduct directly affected the open markets for physical silver and paper silver.

14.     Defendants' manipulative conduct benefited Defendants' proprietary trading positions but harmed Plaintiff and other class members. Defendants'

manipulative conduct resulted in tremendous illegitimate profit, potentially in the hundreds of millions of dollars, for the Defendants and/or their co-conspirators.

15.   U.S. and European authorities are presently investigating the Fix.   The U.S. Commodity Futures Trading Commission (CFTC) said last March that it had "started internal discussions on whether the daily setting of gold and silver benchmarks is open to manipulation." The U.K. Financial Conduct Authority and the German Federal Financial Supervisory Authority are also investigating the Fix.

16.   The intense regulatory scrutiny prompted Deutsche Bank to announce in January of this year that it would withdraw from the Silver Fixing.  In May, the London Silver Market Fixing Ltd., the Fix's administrative shell, announced that after 116 years, the Fix would cease to operate on August 14, 2014.  The Silver Fixing has since been replaced by an electronic exchange administered by CME and Thompson Reuters.

17.   Defendants' unlawful conduct netted Defendants tremendous benefits, including an information advantage that translated into an average annualized return, since the year 2000, of 87%, and an intraday price suppression advantage, wherein the Fix created and traded at prices that were statistically lower than the open market would otherwise bear.  Defendants thus had ample motive to conspire.

18.   As a direct result of Defendants' unlawful conduct alleged herein, Plaintiff and the Class purchased and sold silver at artificial prices; Plaintiff and the Class are presumed to have been injured and damaged thereby.

## JURISDICTION AND VENUE

19.    This action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, Sections 4 of the Clayton Act, 15 U.S.C. § 15, and Section 22 of the CEA, 7 U.S.C. § 25.

20.    Silver is a "commodity" and is the "commodity underlying" silver futures traded on the COMEX, as those terms are defined and used in Sections 1a and 22 of the CEA (7 U.S.C. §§ 1a(4) and 25(a)(l)(D)) respectively.

21.    This Court has jurisdiction over this action pursuant to Section 22 of the CEA, 7 U.S.C. § 25, Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26(a), and 28 U.S.C. §§ 1331 and 1337.

22.    Venue is proper in this District under 7 U.S.C. § 25, 15 U.S.C. §§ 15(a) & 22, and 28 U.S.C. § 1391(b), (c) and (d), because during the Class Period, Defendants resided, transacted business, were found, or had agents in the United States, including in this District, and a substantial portion of the alleged activity affected interstate trade and commerce, including in this District.

23.    Defendants, directly and indirectly, singly and in concert, made use of the means and instrumentalities of transportation or communication in, or the instrumentalities of, interstate commerce, or of the mails in connection with the unlawful acts and practices and courses of business alleged in this Complaint.

24.    Silver and silver derivatives contracts, like COMEX silver futures contracts, are commodities that trade in interstate commerce. Defendants' restraint of trade and intentional manipulation of silver and silver derivatives prices had direct,

substantial and foreseeable effects in the United States and on Plaintiff and members of the Class.  Billions of dollars of silver and silver derivatives were traded in the United States during the Class Period.  Defendants, as members of the Silver Fixing and sophisticated market participants, knew that during the Class Period, the results of the Silver Fixing were disseminated in the United States, and were used to price silver and silver derivatives, including COMEX silver futures contracts. For these reasons, Defendants knew that manipulating the Fix, would, and did, have direct, substantial and reasonably foreseeable effects in the United States, including on the prices of silver derivatives such as COMEX silver futures contracts.

## PARTIES

### Plaintiff

25.    Plaintiff Don Tran is a natural person residing in El Monte, California. Mr. Tran participated in the market for silver-backed derivative products during the Class Period.

### Defendants

26.    Defendant Bank of Nova Scotia ("Scotiabank") is a Canadian public company with its principle place of business located at 44 King Street West, Toronto, Ontario Canada M5H 1H1.  Scotiabank trades on the New York Stock Exchange (BNS), and was a member of the Fix during the entire Class Period.

27.    Defendant Deutsche Bank AG ("Deutsche Bank") is a German financial services company headquartered in Frankfurt, Germany. Deutsche Bank maintains branches and/or offices in this District, and trades on the New York Stock Exchange (DB).  Deutsche Bank was a member of the Fix throughout the Class Period.

28.   Defendant HSBC Bank PLC is a company organized in the United Kingdom with its principal place of business in London, England, and with offices or branches in this District.  Defendant HSBC Bank U.S.A., N.A. is a federally chartered banking corporation with its principal place of business located at 1800 Tysons Boulevard, McLean, Virginia 22102.  HSBC Bank PLC and HSBC Bank USA, NA, are collectively referred to herein as "HSBC."   HSBC trades on the New York Stock Exchange (HSBC) and was a member of the Fix during the entire Class Period.

29.   During the Class Period, Defendants Scotiabank, Deutsche Bank, and HSBC were fixing Members of the Silver Fix, and participated in the unlawful combination and conspiracy alleged herein.

30.   During the Class Period, Defendants, either directly or through their subsidiaries or affiliates engaged in for-profit trading of silver and silver derivatives, including COMEX silver futures, which were traded and/or valued based on the Silver Fix.

## AGENTS AND UNNAMED CO-CONSPIRATORS

31.   Various other entities and individuals, including, but not limited to, subsidiaries and/or affiliates of Defendants, participated as co-conspirators and manipulators in the acts complained of and performed acts and made statements that aided and abetted and furthered the unlawful conduct as alleged herein. The unnamed co-conspirators, along with the above-named Defendants, performed, participated in, furthered, and/or combined, conspired, or agreed with others to perform the unlawful acts alleged herein, including the restraint of trade, fixing, and manipulation of the

Silver Fixing and prices of silver derivatives, including COMEX silver futures contract prices.

**CLASS ACTION ALLEGATIONS**

32.    Plaintiff brings this action on behalf of himself and, under Rules 23(a) and (b) of the Federal Rules of Civil Procedure, on behalf of a Class defined as follows:

> All persons or entities that transacted in physical silver or COMEX silver futures at any time from **January 1, 2007, to August 13, 2014.** Excluded from the Class are Defendants and their officers, directors, management, employees, subsidiaries, and affiliates, and all federal governmental entities.

33.    Members of the Class are so numerous and geographically dispersed that joinder is impracticable. Further, the Class is readily identifiable from information and records in the possession of Defendants.

34.    Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and members of the Class were damaged by the same wrongful conduct of Defendants.

35.    Plaintiff will fairly and adequately protect and represent the interests of the Class.  The interests of the Plaintiff are coincident with, and not antagonistic to, those of the Class.

36.    Plaintiff is represented by counsel with experience in the prosecution of class action antitrust litigation.

37.   Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members, thereby making damages with respect to the Class as a whole appropriate. Questions of law and fact common to the Class include, but are not limited to:

a.    Whether Defendants fixed and manipulated the price of silver and

COMEX silver futures;

    b.    The length of the conspiracy;

    c.    Damages resulting from the conspiracy; and

    d.    Whether Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

38.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort or expense that numerous individual actions would require. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

39.    Plaintiff knows of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## SUBSTANTIVE ALLEGATIONS

## I.    THE LONDON SILVER FIX AND THE COMEX

### A.    <u>Silver prices were set by the Fix</u>

40.    Silver prices were set each day during the Class Period by the concerted actions of the Silver Fixing Members – a panel of three multinational banks, Defendants Deutsche Bank, HSBC, and Scotiabank. The Fixed Price was then used to determine prices worldwide.

41.    Each business day during the Class Period the Fix Members –Deutsche Bank,

HSBC and Scotiabank – met on a secure conference call at noon London-time to fix the price of silver.  The Silver Fixing typically ran between a few minutes and 15 minutes.  The Silver Fixing process was an auction lead by one of the Members, designated as the Chairman.  The Chairman position rotated annually among the members.

42.     Although the proceedings were secret, each of the Silver Fixings during the Class Period reportedly started with the Chairman's determination of what is considered to be the U.S. Dollar "spot price" or current market price of silver in the London market. That was the opening price for the auction.

43.     The Silver Fixing Members then began trading at the opening price.  Each Silver Fixing Member would examine its order book, which contained orders from both its clients' brokerage accounts and its own trading desks.  The Members then declared how many bars of silver they were willing to buy or sell at the opening price in 50 bar increments.

44.     After each participant placed their order, the transactions were netted against each other.  If the amount of buying interest was equal to the amount of selling interest, the Silver Fixing was complete. Otherwise the Chairman would adjust the price up or down and the process would be repeated until the total amount of silver for purchase was within 300 bars of the total amount for sale. If for some reason this 300 bar threshold could not be reached, the Chairman could unilaterally fix the price of silver and the Members would divide the excess supply or demand pro-rata among themselves.

45.     Once the Silver Fixing process was complete, the final price would be published to the worldwide market. That price was used as the spot price for silver worldwide.

**B.     <u>Silver futures prices during the Class Period were set on the COMEX</u>**

46.     Silver futures contracts are exchange-traded on Commodity Exchange, Inc.—the

COMEX.

47.    As a Designated Contract Market of the Chicago Mercantile Exchange Group Inc. ("CME"), COMEX has been designated by the CFTC as a contract market under Section 5 of the CEA, 7 U.S.C. § 7.  COMEX submits to the CFTC various rules and regulations for approval through which COMEX designs, creates the terms of, and conducts trading in, various precious metals futures and options contracts, including futures and options contracts for silver.

48.    A standard COMEX silver futures contract is an agreement to buy or sell a fixed amount of silver, generally 5,000 troy ounces, at a specified date in the future. The price of each contract is quoted in U.S. Dollars per troy ounce.  Because each COMEX silver futures contract is an agreement to buy or sell 5,000 troy ounces of silver, the notional value of a contract with a price of $20 is really $100,000 or the agreed-to price per ounce of silver multiplied by 5,000 troy ounces.

49.    COMEX specifies the terms of trading for silver futures contracts, including the trading units, price quotation, trading hours, trading months, minimum and maximum price fluctuations and margin requirements. It also specifies the months in which silver contracts will be available. According to COMEX rules, during each calendar month, contracts that provide for delivery of silver in the following months will be available: (1) the current calendar month; (2) the next two calendar months; (3) any January, March, May, and September falling within a 23-month period; and (4) any July and December falling within a 60-month period beginning with the current month.

50.    While COMEX silver futures contracts can exist for every month of the year, not all contracts are traded with the same frequency. Contracts for certain months are more heavily traded than others.  Generally, the March, May, July, September and December contracts are the

most heavily traded. There is substantially less trading volume in contracts for the remaining months.  A COMEX silver futures contract trades until the third to last business day of the contract month.

51.     Trading occurs both electronically and in person until the last trading day. As COMEX is a member of the CME, COMEX silver futures contracts are traded on the CME Globex and CME ClearPort electronic trading platforms as well as in open outcry auctions on the floor of the New York Mercantile Exchange.

52.     Because a futures contract represents a bilateral agreement, there are always two sides or positions for the related transaction. These positions are equivalent to that of buyer and seller. The person or entity that is buying the futures contract has what is called a "long" position. The one selling the contract has a "short" position.

53.     Those in the long and short positions have different roles as the futures contract nears expiration, or the last trading day for that specific contract.  Longs (as the buyers of the contract) are obligated to take delivery of the underlying commodity, in this case silver, while shorts (as the sellers) are required to make delivery of the amount of silver represented by their contracts.

54.     The process of exchanging metals between buyer and seller is called "settlement." All futures contracts are settled following their expiration, however, in most cases this does not result in an exchange of the physical commodity. In the majority of cases, market participants opt to "financially settle" their futures positions, whereby they do not take or make delivery of the physical commodity.  Instead, these investors offset their obligations with contracts for an equal but opposite position.

55.     The difference between the two contract prices is the profit or loss to the trader.

Traders with long positions, as buyers of the underlying commodity, benefit as the price of the commodity rises since they are able to sell an offsetting short contract at a higher price. Those with short positions, as sellers of the underlying commodity, benefit as the price of the commodity decreases, since they are able to buy an offsetting long contract at a lower price.

**C.   COMEX silver futures prices during the Class
Period were directly related to the Fix**

56.     As a general matter, prices on the spot markets are directly related to corresponding prices on the futures markets. The futures price is the market's consensus of the expected spot price for the underlying physical commodity at a specified future date. Because the futures price is nothing more than an expectation of the future spot price, both futures and physical prices must be and are, in fact, correlated.

57.     The prices of COMEX silver futures are directly and proximately caused by and linked to the silver price, which, during the Class period, was fixed by Defendants' combination. Throughout the Class Period, the closing price of COMEX silver futures directly track the Fixed Prices published by the Silver Fixing Members.  In fact, published regression analyses have ascribed greater than 99% of the variation in the price of active COMEX silver futures contracts between 2004 and 2013 to the results of the Silver Fixing.

**D.   Defendants intentionally manipulated COMEX silver futures**

58.     Defendants, each a sophisticated market participant, were aware of the impact that the Silver Fixing had and continued to have on the price of silver and silver derivatives such as COMEX silver futures contracts.

59.     The Defendants, as Silver Fixing Members responsible for establishing the spot price of silver worldwide, had a duty to conduct the Silver Fixing in such a manner that reflected actual supply and demand in the market.

60.     Instead, during the Class Period, Defendants breached their duties and responsibilities as Silver Fixing Members by, *inter alia*, permitting their unique proprietary interests to interfere with their price submissions, which should have been solely reflective of their supply and demand orders.  In this way, among others, Defendants manipulated the price of silver and silver derivatives to artificial levels that benefitted their positions in physical silver and silver derivatives, including COMEX silver futures contracts.

61.     Defendants unlawfully used their advanced, inside knowledge of the Silver Fixing to establish positions in the silver market, including positions in COMEX silver futures that would increase in value once the results of the Silver Fixing were released to the public.

62.     In a scheme akin to front running, Defendants, with complete and unaudited control over the results of the Silver Fixing, colluded with each other about price-point at which to fix the price of silver, and then either directly or through contact with their trading desks established positions in the silver market that would derive a financial benefit following the public release of the Fixed Price to the general market.

63.     For example, if Defendants decided that the Fixed Price would be lower than that currently reflected in the trading price of COMEX silver futures contracts, Defendants would establish short COMEX silver futures positions that would increase in value once the Silver Fixing results were released to the public and the price of silver decreased.

64.     This manipulative conduct rendered Defendants' COMEX silver futures positions, including those initiated and liquidated during or around the time of the Silver Fixings, an illegitimate part of the supply-demand equation for the prices of all COMEX silver futures contracts.

## II.    RECENT INDICATIONS OF MANIPULATION AND COLLUSION

### A.    Government investigations into the Fix

65.    U.S. and European authorities are investigating the Silver Fixing. In particular, the U.S. Commodity Futures Trading Commission (CFTC) said last March that it had "started internal discussions on whether the daily setting of gold and silver benchmarks is open to manipulation."

66.    Dr. Elke König, the President of BaFin, German Federal Financial Supervisory Authority – one of the European Agencies investigating the Silver Fixing –gave a speech on January 16, 2014, in which she remarked: "Markets depend on the trust of the wider public that they are performing and that they work honestly."  BaFin reportedly made a demand for documents from Deutsche Bank.

### B.    Deutsche Bank's withdrawal and the demise of the Fix

67.    The investigations led Deutsche Bank, which has been on the panel for twenty years, to withdraw from the Fix.  Deutsche Bank tried to sell its seat on the panel, but, tellingly, there were no takers.

68.    With Deutsche Bank scheduled to withdraw, no takers for its seat, and only two Members left on the Silver Fixing panel, Defendants announced earlier this year that they would abandon their cartel as of August 14, 2014.

69.    Since then, electronic trading has replaced the Silver Fixing process for benchmarking the price of silver.

### C.    Economic evidence suggests collusion and manipulation

70.    A recently released study strongly indicates that silver prices have been manipulated during the Class Period.  University of Western Australia's Andrew Caminschi, a

recognized authority in the field, has conducted a recent study into the Silver Fixing, which outlines "undeniable" collusion in setting silver prices through the Silver Fixing.  Among the author's key findings are that:

    a.   The Silver Fixings definitively impacted the public market for silver;

    b.   Silver exhibited a downward bias of 10-12 basis points in intraday trading prices around the time of the Silver Fixings;

    c.   Strong empirical evidence indicates that the Silver Fixing process did not reflect or approximate behavior of open market trading, in that the Fixed Price was consistently lower than the already suppressed open market price for silver, and returns on the commodity were predominantly negative across the Silver Fixing.

    d.   Silver traders in possession of price direction information have a daily average advantage of 25 basis points over traders not in possession of that information.

    e.   Anomalous trading activity, observed to be highly predictive of the ultimate silver price direction, is suggestive of front running by the "informed" traders, (*i.e.* the Fix Members and their co-conspirators).

71.    An interview with Mr. Caminschi, in June 2014 by Kitco News for an article entitled, Good News -- Silver Fix is Ending, reports the expert to state that "[i]t is statistically undeniable . . . There is this trade advantage that is granted to the fix participants."

72.    In the interview, Caminschi stated that he found a statistically significant difference in prices of silver—both physical and futures—in the five minutes before and the five minutes after the noon Silver Fixing, accompanied by a distinct tradable advantage to insiders.

73.    Hence, it is statistically undeniable that Defendants had ample motive to conspire.

The trading advantage was astounding—25 basis points per fixing—**translating to an annualized return of 87% for the Defendants and other insiders**, since January 1, 2000.

## III.   DEFENDANTS CAUSED ANTICOMPETITIVE EFFECTS DURING THE CLASS PERIOD

74.   On information and belief, by their conspiracy and their overt acts in furtherance thereof, Defendants did in fact fix and manipulate the price of silver and silver futures during the Class Period.

75.   Plaintiff and members of the Class did in fact transact in COMEX silver futures, which materially and proximately caused Plaintiff and members of the Class injury to their business and property, within the meaning of Section 4 of the Clayton Antitrust Act.

## IV.   CONCEALMENT OF UNLAWFUL CONDUCT AND EQUITABLE TOLLING

76.   Plaintiff disclaims any burden to plead facts regarding the statute of limitations.

77.   By its very nature, as alleged herein, Defendants' unlawful activity was self-concealing. By Defendants' affirmative acts, misrepresentations, and nondisclosures, any applicable statute of limitations on claims asserted by Plaintiff and members of the Class have been and are tolled.

78.   Plaintiff and members of the Class had no knowledge of the unlawful conduct alleged in this Complaint, or of any facts that could or would have led to the discovery thereof, until at least 2014.  In the exercise of reasonable diligence, Plaintiff could not have discovered Defendants' violations of law such that suit could be brought before 2014.

## CAUSES OF ACTION

### COUNT I

**PRICE FIXING**
**(Section 1 of the Sherman Act)**
**AGAINST ALL DEFENDANTS**

79. Plaintiff incorporates by reference and re-alleges the preceding allegations, as though fully set forth herein.

80. Defendants and their unnamed co-conspirators entered into and engaged in a combination and conspiracy in an unreasonable and unlawful restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, et seq.

81. During the Class Period, Defendants controlled the Silver Fixing and therefore controlled the price of silver, including the prices of silver derivatives and COMEX silver futures contracts. Defendants competed in these markets.

82. The combination and conspiracy consisted of a continuing agreement, understanding or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants fixed, maintained, or made artificial the Silver Fixing and the price of silver and silver derivatives, including silver futures contracts. Defendants' conspiracy is a per se violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

83. Defendants' conspiracy and resulting impact on the Silver Fixing and the prices of silver and silver derivatives, including silver futures contracts occurred in or affected U.S. interstate commerce.

84. As a proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class have suffered injury to their business or property. Without

limiting the generality of the foregoing, Plaintiff and members of the Class paid artificial and non-competitive prices for silver futures contracts as a proximate result of Defendants' anticompetitive conduct. Plaintiff and the other members of the Class were also deprived of the benefits of free and open competition in transacting silver futures contracts.

85.    Plaintiff and members of the Class are each entitled to treble damages for the Defendants' violations of the Sherman Act alleged herein, and a permanent injunction restraining Defendants from engaging in additional anticompetitive conduct.

## COUNT II

### PRICE MANIPULATION
### (Section 1 of the Commodity Exchange Act, 7 U.S.C. §1, *et seq.*)
### AGAINST ALL DEFENDANTS

86.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

87.    Defendants, through their acts alleged herein, specifically intended to and did cause unlawful and artificial prices in silver and silver derivatives, including COMEX silver futures contracts in violation of the CEA, 7 U.S.C. § 1, et seq.

88.    Each Defendant individually had and all Defendants collectively had the ability to cause and did cause artificial prices.

89.    The Dodd-Frank Wall Street Reform and Consumer Protection Act ("DoddFrank") amended Section 6(c)(l) to the CEA. Under Section 6(c)(l), codified at 7 U.S.C. § 9, and Section 22 of the CEA, as amended, 7 U.S.C. § 25, it is unlawful for any person, directly or indirectly, to use or employ or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate

commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commodity Futures Trading Commission ("CFTC"), shall promulgate not later than one year after July 21,2010, the date of enactment of Dodd-Frank.

90.    The CFTC promulgated Rule 180.1(a), 17 C.F.R. § 180.1(a), in July 2011.

91.    Defendants also violated CFTC Rule 180.1(a), by inter alia, trading silver and silver derivatives, including COMEX silver futures, based on non-public inside information obtained and used by them in breach of their duty as Silver Fixing Members. Defendants, as sophisticated market participants responsible for the setting of global silver prices, had a duty to set prices reflective of legitimate supply and demand fundamentals, and not cause, exacerbate or further any manipulation of silver or silver futures prices. Instead, Defendants abused their position of trust and breached their duties and responsibilities as Silver Fixing Members to cause a specifically plead price artificiality in silver and silver futures prices. These acts rendered Defendants' pre-arranged execution of COMEX silver futures positions before and around the Silver Fixing an illegitimate part of the supply-demand equation for the prices of COMEX silver futures contracts.

92.    As a direct result of Defendants' unlawful conduct, Plaintiff and members of the Class have suffered actual damages and injury in fact due to artificial COMEX silver futures contract prices to which they would not have been subject but for the unlawful conduct of the Defendants as alleged herein. Plaintiff and members of the Class were further legally injured and suffered injury in fact because they transacted in

silver derivatives, including COMEX silver futures contracts, in an artificial and manipulated market operating under the artificial prices caused by the Defendants. Defendants' conduct is presumed to have caused injury to the Plaintiff and the Class.

93.    Plaintiff and members of the Class who purchased or sold silver or silver derivatives, including COMEX silver futures contracts, during the Class Period were injured and are each entitled to their actual damages for the violations of the CEA alleged herein.

## COUNT III

### AIDING AND ABETTING
(Section 1 of the Commodity Exchange Act, 7 U.S.C. §1, *et seq.*)
### AGAINST ALL DEFENDANTS

94.    Plaintiff incorporates by reference and re-alleges the preceding allegations, as though fully set forth herein.

95.    The Defendants each knowingly aided, abetted, counseled, induced and/or procured the violations of the CEA by other Defendants as alleged herein. Each Defendant did so knowing of other Defendants' manipulation of the Silver Fix, and COMEX silver futures contracts, and substantially and willfully intended to assist these manipulations to cause the prices of COMEX silver futures contract prices to be artificial during the Class Period, in violation of §22(a)(1) of the CEA, 7 U.S.C. §25(a)(1).

96.    Under §13(c)(a) of the CEA, 7 U.S.C. §13, Defendants are liable for willfully intending to assist the manipulation.

97.    Other persons willfully intended to assist these manipulations to cause the price of COMEX silver futures contracts to reach artificial levels during the Class

Period, in violation of Section 22(a)(1) of the CEA, 7 U.S.C. § 25(a)(1). They are the agents and unnamed coconspirators as alleged herein.

98.   Plaintiff and members of the Class are each entitled to actual damages sustained in COMEX silver futures contracts for the violations of the CEA alleged herein.

## COUNT IV

### PRINCIPAL AGENT LIABILITY
(Section 1 of the Commodity Exchange Act, 7 U.S.C. §1, *et seq.*)
### AGAINST ALL DEFENDANTS

99.   Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

100.   Each Defendant is liable under Section 2(a)(1) of the CEA, 7 U.S.C. §2(a)(1), for the manipulative acts of their agents, representatives and/or other persons acting for them in the scope of their employment.

101.   Plaintiff and members of the Class are each entitled to actual damages sustained in silver derivatives, including COMEX silver futures contracts, for the violations of the CEA alleged herein.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands relief as follows:

A.    For an order certifying this lawsuit as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, and designating Plaintiff as the Class representative, and his counsel be appointed as Class counsel;

B.    For a judgment awarding Plaintiff and the Class damages against Defendants for their violations of the CEA, together with prejudgment interest at the maximum rate allowable by law;

C.     For the unlawful conduct alleged herein to be adjudged and decreed to be an unlawful restraint of trade in violation of Section 1 of the Sherman Act;

D.     For Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from continuing and maintaining the conspiracy alleged in the Complaint;

E.     For a judgment awarding Plaintiff and the Class damages against Defendants for their violations of the federal antitrust laws, in an amount to be trebled in accordance with such laws;

F.     For an award to Plaintiff and the Class of their costs of suit, including reasonable attorneys' and experts' fees and expenses; and

G.     For such other and further relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil procedure, Plaintiff respectfully demands a trial by jury of all issues so triable.


Dated:        August 27, 2014
              New York, New York


                                        By: _____
                                           Fred Taylor. Isquith
                                           Thomas H. Burt

                                           WOLF HALDENSTEIN ADLER
                                              FREEMAN & HERZ LLP
                                           270 Madison Avenue
                                           New York, NY 10016
                                           Telephone:  212/545-4600
                                           Facsimile:  212/545-4653

\\760497

25